1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **CENTRAL DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  **AVENTIS PHARMA S.A. and**<br>**AVENTIS PHARMACEUTICALS,**<br>12  **INC.,** | Case Nos.<br>    5:03-00887-MRP (PLA) [lead]<br>    5:04-00333-MRP (PLA) |
| 13         Plaintiffs,<br>       v. | **ORDER GRANTING Aventis'**<br>**Motion to Dismiss and DENYING**<br>**Amphastar's Discovery Application** |
| 14  **AMPHASTAR**<br>**PHARMACEUTICALS, INC.,** | |
| 15 | |
| 16         Defendant. | |

17  **INTRODUCTION**

18          One of the plaintiff-counterdefendants (collectively, "Aventis") holds a

19  patent covering enoxaparin, an important anti-clotting drug. Aventis sells

20  enoxaparin under the brand name "Lovenox."

21          Defendant-counterplaintiff Amphastar wishes to market generic enoxaparin.

22  Seeking to do so, Amphastar in 2003 filed an application with the Food and Drug

23  Administration ("FDA"). In the application, Amphastar certified that Aventis'

24  patent was invalid, unenforceable, or would not be infringed. 21 C.F.R.

25  § 314.94(a)(12)(i)(A)(4).

26          Aventis then sued Amphastar for patent infringement in August 2003.

27  Amphastar counterclaimed for federal antitrust and state unfair competition

28

1  violations. Both sides amended their pleadings several times between 2003 and
2  2004. Extensive discovery continued for years.

3  The case was transferred to this Court in June 2006. Due to this case's
4  peculiar procedural history, Amphastar's inequitable conduct defense to patent
5  infringement was tried first. The counterclaims were stayed. *See Aventis*, 475 F.
6  Supp. 2d at 972, 974-75.

7  Aventis' patent was found unenforceable for inequitable conduct, with this
8  Court's finding entered in February 2007. *Aventis*, 475 F. Supp. 2d 970, *aff'd* 525
9  F.3d 1334 (Fed. Cir. 2008), *reh'g and reh'g en banc denied* (Sept. 25, 2008),
10  *petition for cert. filed* (U.S. Jan. 23, 2009) (No. 08-937). In finding inequitable
11  conduct, this Court concluded that Aventis and its single proffered witness[1]
12  "intended to deceive" the patent office and that "[n]egligence played no role." *Id.*
13  at 994.

14  After the Federal Circuit affirmed the inequitable conduct ruling, this Court
15  granted Amphastar's request to lift the stay on its counterclaims. Amphastar filed
16  another Amended Answer and Second Amended Counterclaims ("SAC"). Aventis
17  now moves to dismiss the SAC.

18  For the following reasons, the Court GRANTS Aventis' motion to dismiss
19  because the allegations that survive *Noerr-Pennington* immunity fail to allege
20  antitrust injury, a necessary element. Because no federal issue survives, the state
21  claims will not be addressed at this time. In light of these rulings, Amphastar's
22  application for additional discovery is DENIED.

23
24
25
26
27

28

---

[1] Others involved in the events surrounding the inequitable conduct stated in
depositions that they had no recollection of any relevant facts. *Id.* at 988 n.17.

# I.

# BACKGROUND

## A.    The Drug Approval Process

A manufacturer seeking approval of a new drug must file a New Drug Application ("NDA") with the FDA. An NDA includes detailed safety and efficacy data, as well as a listing of the components and composition of the drug, "a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug," samples of the drug, and proposed labeling. 21 U.S.C § 355(b)(1).

In addition, the NDA must include the patent numbers and the expiration dates of any patents which claim the drug and methods of using the drug, but not methods of manufacturing the drug. *Id*. After approval, these patents are listed in a publication commonly known as the "Orange Book." Drugs with NDA approval are known as "brand-name" drugs.

The "Hatch-Waxman Act" aims to speed generic approval. 21 U.S.C. § 355. Under the Act, a generic drug manufacturer may file an Abbreviated New Drug Application ("ANDA") so it can market a generic version of a previously approved brand-name drug. The ANDA must include data showing that the active ingredient or ingredients of the generic drug are the "same" as that of the brand-name drug, that the generic drug is bioequivalent to the brand-name drug, and that the proposed labeling of the generic drug is the same as the brand-name drug. *Id*. § 355(j)(2)(A)(ii). The ANDA applicant is not required to duplicate the clinical trials that were required for approval of the brand-name drug.

In addition, the ANDA applicant must certify for each relevant Orange Book-listed patent:

> (I)    that such patent information has not been filed,
>
> (II)    that such patent has expired,
>
> (III)    of the date on which such patent will expire, or

1
      (IV)    that such patent is invalid or will not be infringed

2
              by the manufacture, use, or sale of the new drug

3
              for which the application is submitted[.]

4
*Id*. § 355(j)(2)(A)(vii).

5
      FDA regulations interpret patent unenforcability to meet Paragraph IV's

6
invalidity or noninfringement requirement. *See Teva Pharm., USA, Inc. v. United*

7
*States FDA*,  182 F.3d 1003, 1010 (D.C. Cir. 1999) (citing 59 Fed. Reg. at 50,453,

8
59 Fed. Reg. at 50,339); 21 C.F.R. § 314.94(a)(12)(i)(A)(4).

9
      An ANDA applicant making a Paragraph IV certification must give the

10
NDA applicant and patent holder notice of the ANDA and the basis of its patent

11
invalidity, unenforceability, or noninfringement position. 21 U.S.C.

12
§ 355(j)(2)(B)(iv); 21 C.F.R. § 314.94(a)(12)(i)(A)(4).

13
      A Paragraph IV certification constitutes a constructive act of infringement,

14
giving the patent holder standing to sue. 35 U.S.C. § 271(e)(2)(A). Once Paragraph

15
IV notice is received, the patent holder has forty-five days to file suit. 21 U.S.C.

16
§ 355(c)(3)(C).

17
      Filing suit prevents the FDA from approving the ANDA for thirty months

18
from the notice date, subject to some exceptions for court action. *Id*. This

19
provision, the "thirty-month stay," is significant to this case and has begun to

20
generate a body of antitrust case law: unlike an ordinary infringement suit, a

21
Paragraph IV suit bars the FDA from approving an ANDA, thereby excluding the

22
would-be entrant from the market.

23
      The first successful ANDA applicant receives a 180-day period of generic

24
marketing exclusivity, beginning on the earlier of the generic manufacturer's first

25
marketing date or the date of a judicial decision of patent invalidity or

26
noninfringement. *Id*. at § 355(j)(5)(B)(iv).

27
      Any person may try to affect FDA action, including action on an ANDA.

28
The FDA encourages this, maintaining an open invitation to the public to file a

"citizen petition." 21 C.F.R. § 10.30(a). A petitioner can urge the FDA to issue, amend, or revoke a regulation or order; or to act or refrain from acting. *Id.* § 10.30(b). The petition is then "docketed," the FDA invites comment on the petition, and the FDA "rule[s]" on each petition. *Id.* § 10.30(c)-(e). The FDA must approve, deny, or provide a tentative response to the petition within 180 days. *Id.* at § 10.30(e). A party may supplement, amend, or withdraw the petition before it has been ruled on by the FDA. *Id.* at § 10.30(g). The FDA's decision is limited by the record generated in the citizen petition process. *Id.* § 10.30(j).

**B.     The Enoxaparin Applications and Litigation**

Enoxaparin is somewhat unusual for a pharmaceutical drug: it is a mixture of complex molecules. The molecules' structure and mixture's composition are not entirely known (i.e., enoxaparin has not been "fully characterized"). *See Aventis v. Amphastar*, 475 F. Supp. 2d 970 (C.D. Cal. 2007) (discussing some technical aspects of enoxaparin).

Aventis received FDA approval for its Lovenox NDA. The Orange Book-listed patents material to this motion are 5,389,618 and RE 38,743. The latter is a reissue patent that replaced the original patent after suit was filed. The distinction is immaterial to this motion; "the Lovenox Patent" therefore refers to either patent, as relevant.

Aventis filed a citizen petition on February 19, 2003, before any enoxaparin ANDAs were filed. FDA docket no. 2003P-0064:CP1, *available at* http://www.fda.gov/ohrms/dockets/DOCKETS/03p0064/03p0064.htm. The citizen petition argues that since enoxaparin is not fully characterized, its manufacturing process determines the product. *Id.* at 1-2. Unless and until enoxaparin can be fully characterized, generic entrants should submit to the full NDA process or show that their manufacturing processes are equivalent to Aventis' process. *Id.* Otherwise, an entrant cannot show its enoxaparin is the "same" within the meaning of the statute. *Id.*; 21 U.S.C. § 355(j)(2)(A)(ii)(I). To illustrate, Aventis argues that a particular

1   chemical feature present in a certain proportion is important to enoxaparin's safety

2   and efficacy. *Id.* at 3.

3        Amphastar filed an ANDA for approval of generic enoxaparin in March

4   2003. Amphastar made a Paragraph IV certification for the Lovenox patent and

5   notified Aventis on June 19, 2003. As the first ANDA filer to challenge the

6   validity of a patent covering enoxaparin, if successful, Amphastar will enjoy 180

7   days' exclusivity under 21 U.S.C. § 355(j)(5)(B)(iv).

8        Aventis filed this lawsuit against Amphastar on August 4, 2003, alleging

9   infringement of the Lovenox patent. The lawsuit triggered the thirty-month stay of

10  Amphastar's ANDA under *id.* § 355(j)(2)(B)(iii). The automatic stay was removed

11  by court judgment before thirty months elapsed. 21 U.S.C. § 355(j)(2)(B)(iii);

12  *Aventis*, 390 F. Supp. 2d 936.

13       The day after Aventis filed suit, August 5, 2003, the FDA issued a tentative

14  response to Aventis' citizen petition. The response stated, "FDA has been unable

15  to reach a decision on your requests because they raise complex issues requiring

16  extensive review by Agency officials."  Letter from Jane A. Axelrad, Assoc. Dir.

17  for Policy, Center for Drug Eval. and Research, Dept. of Heath & Human Services,

18  to Peter O. Safir and Scott L. Cunningham, Covington & Burling (Aug. 5, 2003),

19  *available at* http://www.fda.gov/ohrms/dockets/dailys/03/Aug03/080603/03p-

20  0064-let0001-vol3.pdf.

21       Amphastar filed a comment on the citizen petition on May 13, 2004, stating

22  that Aventis had changed its manufacturing process seventeen times in eight years,

23  undermining its argument that the manufacturing process must be the same to

24  result in the same active ingredient. Letter from Stephen A. Campbell, Senior VP,

25  Regulatory Affairs, Amphastar Pharm., Inc. to Lester M. Crawford, Acting

26  Commissioner, FDA (June 1, 2004), *available at*

27  http://www.fda.gov/ohrms/dockets/dailys/04/June04/060804/03p-0064-c00002-

28  vol3.pdf.  The letter characterized Aventis' citizen petition as an "endless delay

tactic[] in order to keep their drug 'Evergreen.'" *Id.* at 2. Amphastar also discussed studies that "answered all of the FDA's questions [about its ANDA] in detail" and asserted that its enoxaparin was equivalent to Aventis' Lovenox.

A series of supplements to the citizen petition by Aventis and comments on the citizen petition from Amphastar and other parties followed.

To date, the FDA has not taken final action on Aventis' citizen petition. Amphastar's ANDA has not been approved.

## C.   Antitrust and Unfair Competition Allegations

Amphastar alleges that Aventis has engaged in anticompetitive conduct and unfair competition by obtaining and enforcing its patents through fraud. ¶¶ 20-31, 45(a)-(d), 45(f).[2] For example, Amphastar alleges that the Lovenox patent infringement case was "sham litigation for the anticompetitive purpose of delaying or preventing Amphastar's entry into the relevant market." ¶ 45(c).

In addition, Amphastar alleges that Aventis' citizen petition is frivolous. *Id.* Amphastar points to the statement:

> Since the initial development of enoxaparin in 1981, the steps of the manufacturing process have remained unchanged. Clinical supplies used in a few of the initial clinical studies, however, were made from batches where some of the conditions (e.g., time and temperature) were modified.

in footnote 33 of Aventis' citizen petition, claiming it constitutes a materially false representation. Barrett Decl. in Opp'n to Aventis' Mot. to Dismiss, Ex. 1; ¶ 45(e).[3]

---

[2] These and all subsequent paragraph citations refer to the SAC.

[3] Amphastar filed the SAC under seal, with this allegation redacted in the public version. Amphastar's ground was that it obtained the information in ¶ 45(e) earlier in this case and that this information was subject to the Court's protective order. Aventis did not seek to keep this allegation confidential—in fact, it was discussed in open court at the hearing—but neither did Aventis oppose Amphastar's motion

1      Amphastar also alleges that Aventis "has, or has attempted to, control the

2  supply of components or compositions necessary for market approval or the

3  marketing of enoxaparin." ¶ 45(g).

4      Finally, and only in support of its state claims, Amphastar alleges that

5  Aventis has made false statements about Lovenox's therapeutic levels. ¶ 50.

## II.

## LEGAL STANDARD

8      A motion to dismiss tests whether the allegations in a complaint, if true,

9  amount to an actionable claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.

10  2001). In evaluating a defendant's motion to dismiss under Fed. R. Civ. P.

11  12(b)(6), a court must accept as true all allegations of material fact in the complaint

12  and read the complaint in the light most favorable to the nonmoving party.

13  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Parks Sch.*

14  *of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). However, a court

15  should not accept as true unreasonable inferences; nor should it accept legal

16  conclusions cast in the form of factual allegations. *Sprewell*, 266 F.3d at 988. A

17  court reads the complaint as a whole, together with facts appropriate for judicial

18  notice, rather than isolating allegations and taking them out of context. *Tellabs,*

19  *Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

20      The foregoing principles of notice pleading do not eliminate the requirement

21  that a plaintiff plead sufficient factual allegations to demonstrate a plausible claim.

22  *Bell Atlantic Corp. v. Twombly*, 127 U.S. 1955, 1964-66 (2007). Where a

23

---

24  to file it under seal. *See, e.g.* Hearing Tr. at 46, 1-3 (Jan. 26, 2009) (statement of

25  counsel for Amphastar). *See also* Letter from Stephen A. Campbell, Senior VP,

26  Regulatory Affairs, Amphastar Pharm., Inc. to Lester M. Crawford, Acting
Commissioner, FDA (June 1, 2004), *available at*

27  http://www.fda.gov/ohrms/dockets/dailys/04/June04/060804/03p-0064-c00002-

28  vol3.pdf (pointing out that publicly available records show Aventis' process has
changed at least seventeen times in eight years).

particularly complex claim or set of claims is alleged, the factual burden to overcome a motion to dismiss is more difficult in practice: a court may require more detail to assess the plausibility of complex allegations. *See id.* For example, antitrust allegations must be sufficiently detailed for a court to determine whether they are economically plausible. *Twombly*, 127 U.S. 1955. Such demands are all the more reasonable when the factual basis underlying the allegations is within the plaintiff's knowledge. *Cf. Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) (making a similar observation in the Rule 9(b) context), *cert. denied*, 517 U.S. 1183 (1995). None of this gives courts license to blur the line between a motion to dismiss and summary judgment: "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 127 U.S. at 1965.[4]

## III.

## DISCUSSION

Amphastar alleges that Aventis has violated Sherman Act § 2 by monopolizing the market for enoxaparin products in the United States. ¶ 45; 15 U.S.C. § 2 (hereinafter "§ 2").

Amphastar also alleges that Aventis has violated California state law for "common law unfair competition and statutory unfair business practices." Cal. Bus. & Prof. Code §§ 17200 *et seq.* The conduct alleged under state law is the same as that under the federal law, with the addition of allegedly false statements regarding Lovenox's therapeutic levels. ¶ 52.

The § 2 monopolization offense requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*,

---

[4] Some SAC allegations trigger Rule 9(b)'s heightened standard for pleading fraud. Rule 9(b) is discussed below where it applies.

1    384 U.S. 563, 570-71 (1966).

2    For Amphastar to maintain its private antitrust claims, it must also show

3    injury and causation. Therefore, Amphastar must adequately plead (3) that

4    Aventis' misconduct caused (4) an injury to competition or the competitive process

5    that harmed Amphastar. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S.

6    477, 489 (1977); *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806-07

7    (D.C. Cir. 2001) (discussing antitrust injury and causation in the Hatch-Waxman

8    context); 15 U.S.C. § 15 (creating the private antitrust cause of action).[5]

9    **A.     The Alleged Courses of Conduct Must Be Analyzed Separately**

10   Amphastar contends that all Aventis' alleged conduct, even if each act is

11   legal on its own, must be reviewed as a single course of conduct. The theory is that

12   the whole is greater than the sum of its parts. However, that cannot be the law in a

13   case where special immunity exempts some conduct from antitrust scrutiny.

14   The Supreme Court recognizes that, at the fact-finding stage, antitrust

15   plaintiffs are entitled to "the full benefit of their proof without tightly

16   compartmentalizing the various factual components and wiping the slate clean

17   after scrutiny of each." *Continental Ore Co. v. Union Carbide and Carbon Corp.*,

---

19   [5] The minimum required injury for standing is "*some* damage flowing from the

20   unlawful [antitrust misconduct]; inquiry beyond this minimum point goes only to

21   the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research,*

     *Inv..*, 395 U.S. 100, 114 n.9 (1969) (emphasis in original). Standing also requires

22   that the antitrust violation be a "material cause" of that damage. *Id.* Material

23   causation and injury in fact are jurisdictional issues; even if they are satisfied at the

24   pleading stage, the requirements must continue to be satisfied at all stages of the

     case.

25   Contrary to Aventis' implications, these jurisdictional requirements are not the

26   same as antitrust injury. The antitrust injury element (4) of the substantive antitrust

     offense asks whether the injury in fact is the type the antitrust laws remedy; not

27   whether there has been injury in fact. PHILLIP E. AREEDA ET AL., ANTITRUST LAW,

28   ¶¶ 335b, e-f (3d ed. 2007) (emphasizing that the standing test remains the same at

     all stages and clarifying that antitrust injury is not the same as standing).

370 U.S. 690, 699 (1962). That is, relevant circumstantial evidence should be considered in making a fact determination. *Id.* at 697-98. The same principle applies at the pleading stage: allegations should generally be taken as a whole, together with matters appropriate for judicial notice. *Tellabs*, 127 S. Ct. at 2509.

But antitrust is not devoid of areas where alleged conduct is analyzed discretely as a matter of law. *See, e.g.*, *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) (holding that alleged predatory pricing conduct must meet a price test). *See generally* AREEDA, ANTITRUST LAW ¶ 310 (discussing when conduct aggregation is appropriate). Some acts must be segregated where the *Noerr-Pennington* doctrine immunizes some conduct from antitrust scrutiny. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

*Noerr-Pennington* serves First Amendment interests by protecting the petitioning and political activity of market participants. Subject to a limited "sham" exception, speech directed to obtaining government action cannot give rise to an antitrust violation. *Kaiser Found.Health Plan, Inc.  v. Abbott Labs., Inc.*, 552 F.3d 1033, 1044-45 (9th Cir. 2009), *pet. for reh'g and reh'g en banc filed* (Jan. 28 2009), *resp. to pet. ordered* (Feb. 2, 2009). *Noerr-Pennington* applies equally to federal and state claims. *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1059 (9th Cir. 1998).

Pleading a "sham" under *Noerr-Pennington* does not suffice to state a claim. Rather, a plaintiff must survive *Noerr-Pennington* <u>and</u> adequately plead § 2's elements. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Industries*, 508 U.S. 49, 61 (1993) [hereinafter "*Columbia Pictures*"].

"Although the *Noerr-Pennington* doctrine applies to activities directed at any branch of government, the scope of the sham exception depends on the type of governmental entity involved." *Kottle*, 146 F.3d at 1060. This is because the petitioning interests in the executive and legislative realm are strongly protected to

-11-

serve the political process; because government action confounds private causation; and because those realms lack judicially manageable standards. *See id.* at 1060-62. Administrative petitioning poses definitional difficulties: different administrative proceedings receive different levels of protection according to whether they more resemble legislative or judicial proceedings. *Id.*

*Noerr-Pennington*, and its constitutional underpinnings, would be destroyed if an antitrust plaintiff could subject otherwise protected speech to antitrust scrutiny by alleging additional misconduct. *Pennington* itself recognized that objectively legitimate petitioning conduct—even when undertaken in subjective bad faith—"is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670. However, as discussed more fully below, some petitioning conduct may be aggregated into a "petitioning scheme" to determine whether *Noerr-Pennington* applies to that conduct. *Kaiser*, 552 F.3d 1033, at 1046 (citing *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)).

The SAC alleges two courses of conduct to which *Noerr-Pennington* applies: patent-enforcement conduct and FDA conduct. Under *Kottle*, different legal standards apply to these courses of conduct. 146 F.3d 1056, 1060-62. Thus, even if these two courses of conduct could be conceived as a unified "petitioning scheme" within the meaning of *Kaiser* and *California Motor*, the two courses of conduct must be separately evaluated. The conduct, if any, which loses its immunity may then be considered together with the remaining allegations. *Cf.* HERBERT HOVENKAMP ET AL., IP AND ANTITRUST § 11.4f (2009 Supp.) (observing that such an approach properly "avoid[s] the risk of such mixed allegations being used as a subterfuge to avoid the stringent requirements of [petitioning] immunity").

-12-

**C.    Allegations Regarding Aventis' Patent Enforcement Survive *Noerr-Pennington***

The first alleged course of conduct involves patents. Amphastar alleges that Aventis engaged in sham enforcement of the Lovenox patent.[6]

Because this course of conduct involves prosecuting and enforcing a patent, Supreme Court and Federal Circuit law governs. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998), *cert. denied* 525 U.S. 876 (1998).

Under the broadest possible range of exceptions, litigation activity constitutes a sham by meeting any of three tests: (a) "the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful"; (b) a party commits "knowing fraud" on a court by making "intentional misrepresentations" severe enough to "deprive the litigation of its legitimacy"; or (c) "the conduct involves a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose." *Kaiser*, 552 F.3d at 1045 (quoting *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006)).

However, the Federal Circuit expressly recognizes only two types of sham litigation—types (a) and (b), above. *Id.* at 1068 ("Each [t]ype provides its own

---

[6] Amphastar also alleges that Aventis also fraudulently <u>listed</u> Patent No. 4,692,435 ("the '435 patent") in the Orange Book, but that patent expired in 2001. *See* ¶ 45(b). Because the '435 patent had expired, it was not the subject of a Paragraph IV certification and did not trigger a Hatch-Waxman stay. Further, there is no allegation that this patent was ever asserted against Amphastar. Nor is there any allegation that the patent caused Amphastar any harm not caused by the Lovenox patent. Therefore, the '435 patent is immaterial. *Cf. In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363 (S.D.N.Y. 2002) (fraudulently listing a patent in the Orange Book <u>and</u> bringing an enforcement action after a Paragraph IV certification regarding that patent may constitute enforcement conduct). *See also* HOVENKAMP, IP & ANTITRUST § 74.e1 (discussing antitrust concerns about Orange Book patent listing).

1  basis for depriving a patent owner of immunity . . . either or both may be

2  applicable to a particular party's conduct . . . ."). Nevertheless, the Ninth Circuit

3  recently applied its own type (c) law to a patent case. *Kaiser*, 552 F.3d at 1046.

4          The Ninth Circuit reconciles two Supreme Court cases that coexist in some

5  tension by recognizing a third type of sham, type (c), above. The Ninth Circuit has

6  long held that type (b) applies to determine "whether a single action constitutes

7  sham petitioning." *Id.* (quoting *USS-POSCO Indus. v. Contra Costa County Bldg.

8  & Constr. Trades Council*, 31 F.3d 800, 810-11 (9th Cir. 1993)). Type (b) sham

9  litigation is "essentially retrospective." *Id.*

10          Type (c), on the other hand, "is prospective." *Id.* It applies when there is a

11  "series of lawsuits and other legal actions without regard to the merits [because

12  when] dealing with a series of lawsuits, the question is not whether any one of

13  them has merit—some may turn out to, just as a matter of chance—but whether

14  they are brought pursuant to a policy of starting legal proceedings without regard

15  to the merits and for the purpose of injuring a market rival." *Id.* This amounts to

16  potential liability for a "petitioning scheme."

17          The Supreme Court requires all *Noerr-Pennington* shams to pass both an

18  "objective" and a "subjective" test. *Columbia Pictures*, 508 U.S. at 59 ("[N]either

19  *Noerr* immunity nor its sham exception turns on subjective intent alone."). The

20  Ninth Circuit's articulation of type (c) immunity lacks a clearly expressed

21  objective element. *See Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408

22  (D. Del. 2006) 428-30 (discussing this tension between type (c) and subsequent

23  Supreme Court doctrine and ultimately rejecting type (c)).

24          Therefore, a type (c) theory must allege both (1) a subjective policy of

25  starting legal proceedings for the purpose of injuring a market rival; and (2) an

26  objective policy of starting legal proceedings without regard to the merits.

27  Precisely how the objective prong works is unclear, but it appears that the Ninth

28  Circuit favors determining whether a substantial number of the suits lacked

objective merit. *Kaiser*, 552 F.3d at 1046-47 (discussing with approval a district court's dissection of seventeen different lawsuits, noting that the district court viewed only six of the suits "as presenting the closest question" of sham litigation).[7]

This Court assumes that the Federal Circuit would agree with the Ninth Circuit's type (c) sham exemption. Whether the Federal Circuit would agree makes no difference to the resolution of the present motion.

**1. Type (a): objectively baseless and subjective abuse of process**

Legal standard. The first method of alleging sham litigation has two steps. First, the litigation must be alleged to be "objectively baseless." *Columbia Pictures*, 508 U.S. at 60 (1993). Second, the defendant must subjectively intend to use the judicial "*process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Id.* (emphasis in original).

As to the objective test, the "challenged lawsuit's *legal* viability" is assessed first. *Id.* at 61 (emphasis in original). Thus, conduct that includes "ignoring the law, filing administrative or legal actions that do not request reasonable extensions or development of the law and mischaracterization of the relevant issues or legal standards" may be stripped of immunity. *Louisiana Wholesale Drug Co., Inc. v.*

---

[7] A Court in the Northern District recently observed a similar problem with the type (c) theory. It held that otherwise protected conduct could be included in the antitrust analysis if a court "first find[s] that the other aspects of the scheme independently produce anticompetitive harms." *Hynix Semiconductor, Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1090-91 (N.D. Cal. 2007). *Hynix* was decided before *Kaiser*, where the Ninth Circuit's approach is incompatible with the *Hynix* test. Further, the *Hynix* test conflates *Noerr-Pennington* immunity with the substantive § 2 element of antitrust injury. Not only is that doctrinally incorrect, it may not be necessary: if, in the but-for world, the patent could not have been enforced, damages flowing from enforcement may be recoverable, even if the substance of the petitioning activity cannot be used to plead or prove an antitrust violation. *Cf.* HOVENKAMP, IP AND ANTITRUST § 11.4f (approving *Hynix*'s damages outcome but not the doctrine).

1    *Sanofi-Aventis*, 2008 WL 4580016, at *4-5, 2008 U.S. Dist. LEXIS 81328, at *13-

2    18 (S.D.N.Y. Oct. 14, 2008). If the lawsuit is legally viable, a court may turn to

3    whether the defendant had factual probable cause to institute the suit. *Columbia*

4    *Pictures*, 508 U.S. at 62.

5         <u>Ripeness.</u> As a threshold matter, this issue is not yet ripe. Aventis has

6    pending a petition for certiorari on inequitable conduct. Aventis' legal position

7    could yet be vindicated. Therefore, the *Columbia Pictures* "retrospective" test is

8    not yet fit for judicial application. *Alaska Right to Life Pol. Action Comm. v.*

9    *Feldman*, 504 F.3d 840, 849 (9th Cir. 2007) ("Prudential ripeness . . . involves two

10   overarching considerations: the fitness for judicial review and the hardship to the

11   parties of withholding court consideration.") (internal quotations and citation

12   omitted).

13        <u>Objectively baseless.</u> However, even assuming ripeness, Amphastar cannot

14   meet *Columbia Pictures*' objectively baseless prong. Aventis' legal contentions

15   cannot be seen as objectively baseless. The Court is well aware of this case's long

16   and complicated procedural history, including two Federal Circuit analyses on the

17   merits, with a dissent on this case's most recent Federal Circuit visit. 176 Fed.

18   Appx. 117 (Fed. Cir. 2006); 525 F.3d 1334 (Fed. Cir. 2008). Even though Aventis'

19   <u>factual</u> position suffered from "a total absence of indicia of credibility," 475 F.

20   Supp. 2d at 993, Aventis has made credible <u>legal</u> arguments to change the law or to

21   adopt a not-unreasonable legal interpretation that may change the legal

22   implications of the facts. *See, e.g.*, 525 F.3d 1334; Petition for Certiorari (U.S. 08-

23   937 Jan. 23, 2009). Such arguments further doctrinal development and are

24   unquestionably protected petitioning activity.

25        The Court takes judicial notice of the foregoing facts. Granting Amphastar

26   all reasonable inferences in its favor, Amphastar cannot plead that Aventis' legal

27   positions were objectively baseless.

28

### 2. Type (b): knowing and willful fraud

Legal standard. In the patent context, the second method of alleging sham litigation comes from *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965). The thrust of a *Walker Process* theory is that the obtaining, maintaining, and enforcing a patent are all premised on a knowing and willful fraud. *Kaiser*, 552 F.3d at 1047; *Nobelpharma*, 141 F.3d at 1071.

*Walker Process* requires "the knowing assertion of a patent procured by fraud on the PTO." *Nobelpharma*, 141 F.3d at 1071. Further, the patent must have been enforced with awareness that the patent was fraudulently obtained. *Id.* at 1069. In contrast to the *Columbia Pictures* test, which protects litigants' legal <u>and</u> factual positions, *Walker Process* looks only to whether there was an actual fraud in patent procurement and whether the defendant knew of the fraud when asserting the patent. *Nobelpharma*, 141 F.3d at 1070-71.

The Federal Circuit has repeatedly emphasized that *Walker Process*, unlike inequitable conduct, requires all elements of traditional fraud, including actual reliance, causation, and damages. *Nobelpharma*, 141 F.3d at 1070-71; *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1358-59 (discussing cases), *rev'd on other grounds*, 546 U.S. 394 (2006). One implication of the traditional fraud requirement is that a mere technical violation in the patent office does not satisfy *Walker Process*. *Nobelpharma*, 141 F.3d at 1069-71. Another implication is that Rule 9(b)'s heightened pleading requirements apply to the circumstances constituting fraud. *Unitherm*, 375 F.3d at 1358.

Therefore, *Walker Process* requires (1) fraud in patent procurement and (2) fraudulent enforcement of the patent, including awareness of its fraudulent procurement.

Fraud in patent procurement. The SAC contains plausible and reasonably specific allegations of all patent-procurement fraud elements with respect to the

Lovenox patent. ¶¶ 20-31. While the SAC only uses the magic words "[b]ut for" to allege reliance and causation as to one act, ¶ 24, the allegations, fairly read, state that the patent office relied on Aventis' factual representations and duty of candor and that this reliance caused the Lovenox patent to issue and thereby harmed Amphastar. ¶ 31.

Fraud in patent enforcement. Amphastar adequately alleges that Aventis was aware of the Lovenox patent's fraudulent underpinnings when Aventis engaged in enforcement conduct against Amphastar. ¶¶ 45(a)-(d), (f). This caused Amphastar damage by forcing it to defend the alleged sham.[8]

However, this alleged fraud only removes *Noerr-Pennington* immunity. "[T]he other elements necessary to a § 2 case" must also be present. *Walker Process*, 382 U.S. at 174. One indispensable element is antitrust injury. *Brunswick*, 429 U.S. 477. Whether injury-in-fact from this *Walker Process* fraud amounts to antitrust injury is addressed below in Section III.F.

Amphastar's *Walker Process* allegations survive *Noerr-Pennington* at the pleading stage.

**3. Type (c): fraudulent course of conduct**

Assuming without deciding that the Federal Circuit would adopt the Ninth Circuit's type (c) theory, the SAC fails both prongs: (1) the subjective policy of instituting lawsuits, (2) a substantial number of which suits lack objective merit.

Aventis is on record in this case explaining that it instituted an array of patent enforcement actions to preserve its rights under the Hatch-Waxman Act. This Court presided over most of Aventis' actions and, indeed, stayed those actions pending the outcome of this litigation. Aventis consented to the stay, stating that it filed the series of suits to preserve its rights rather than to harm all potential

---

[8] For purposes of this motion, the Court assumes that Amphastar's attorney fee award did not negate all damages flowing from Aventis' patent enforcement conduct.

generic competitors with frivolous litigation. *See, e.g.*, *Aventis Pharma S.A. v. Sandoz Inc.*, CV 07-3658-MRP (PLAx), Notice of Amended Complaint at 2 (Aug. 29, 2007) (discussing some background) & Ex. C (letter of June 6, 2007 from Aventis to potential generic entrant explaining Aventis' intentions with regard to the suit).

The volume of Aventis' suits in the Hatch-Waxman context matters little, if at all. *Kaiser*, 552 F.3d at 1046-47 (finding at summary judgment that no reasonable jury could find a pattern within the meaning of the type (c) exception where a drug company instituted seventeen infringement suits to protect its rights under Hatch-Waxman). Moreover, for the same reasons explained above in dismissing Amphastar's type (a) theory, Aventis' legal position must be viewed as objectively tenable in all these suits.

The Court takes judicial notice of the foregoing facts. Granting Amphastar all reasonable inferences in its favor, Aventis' <u>legal</u> position was not objectively baseless. Further, it is merely conceivable that Aventis instituted a series of patent suits without regard to the merits and for the purpose of injuring competitors. It is much more plausible that Aventis' several lawsuits were undertaken to preserve its rights under the Hatch-Waxman Act and not as a policy of instituting patent suits without regard to the merits. *Twombly*, 127 U.S. at 1974.

## D. Allegations Regarding Aventis' FDA Conduct Do Not Survive *Noerr-Pennington*

<u>Legal standard.</u> Aventis' conduct in the FDA is not "unique to patent law" and therefore is not subject to the Federal Circuit's exclusive jurisdiction. *Nobelpharma*, 141 F.3d at 1068. Accordingly, Ninth Circuit law applies.

The FDA citizen petition process is an administrative proceeding that the Ninth Circuit has not yet addressed. To determine how *Noerr-Pennington* applies to such a proceeding, the Court must first characterize the proceeding. *Kottle*, 146 F.3d at 1062-63.

1    If petitioning in an administrative proceeding bears the "indicia of a true

2    adjudicatory proceeding," then *Noerr-Pennington* rules developed for the judicial

3    branch will apply. *Id.* at 1062. This is because "[o]nly where administrative

4    officials must follow rules is it meaningful to ask whether a petition before an

5    agency was 'objectively baseless,' or whether there has been a pattern of

6    petitioning without regard to the 'merits' of the petitions." *Id.* at 1061-62.

7    Adjudicatory indicia include "public hearings . . . written and oral statements . . .

8    representation by counsel . . . and question[ing] witnesses." *Id.*

9    On the other hand, where administrative petitioning more closely resembles

10   petitioning in the legislative realm, few or no exceptions may apply. This is

11   because legislative lobbying is the quintessential political realm in which

12   petitioning rights enjoy their greatest protection; where legislative action

13   supersedes private action and thereby makes determining causation impossible;

14   and where it is inappropriate for the judiciary to intrude, even assuming it could

15   divine manageable standards. *Id.* at 1060-62.

16   The FDA's citizen petition process contains some adjudicatory indicia. The

17   FDA maintains an open invitation to the public to petition. 21 C.F.R. § 10.30(a).

18   The petition is then "docketed," the FDA invites comment on the petition, and the

19   FDA "rule[s]" on each petition. *Id.* § 10.30(c)-(e). Importantly, the FDA's decision

20   is limited by the record generated in the citizen petition process. *Id.* § 10.30(j).

21   On the other hand, the citizen petition process resembles lobbying to some

22   extent. A petitioner can urge the FDA to exercise its administrative discretion by

23   issuing, amending, or revoking a regulation or order; or by taking or refraining

24   from an action. *Id.* § 10.30(b).

25   When a citizen petition challenges a drug approval, the process will closely

26   resemble an adjudicatory proceeding. Because the petition record is the sole basis

27   on which the FDA may act on the petition, an applicant (or potential applicant) will

28   need to respond to generate the appropriate record. *Id.* § 10.30.

To the extent a drug is challenged on a statute binding upon the FDA and not admitting of administrative discretion, *Noerr-Pennington* rules developed for the judiciary apply. And to the extent an application is challenged based on specific factual allegations, *Noerr-Pennington* rules developed for the judiciary apply.

But to the extent a citizen petition urges the FDA to exercise administrative discretion, the process more closely resembles traditional legislative or executive lobbying. In this context, courts must exercise great caution, if not abstain from interfering with the process entirely.

Allegations. The SAC alleges: "Aventis filed a frivolous citizen petition that falsely represented that Aventis had not changed its manufacturing process since 1981. This false representation was highly material to the representations Aventis made to the FDA in its citizen petition." ¶ 45(e). *See also* ¶ 27 (discussing the alleged falsity in more detail).

The Court takes notice of the citizen petition. FDA docket no. 2003P-0064:CP1, *available at* http://www.fda.gov/ohrms/dockets/DOCKETS/03p0064/03p0064.htm. The petition's legal basis is the statutory requirement that an ANDA applicant demonstrate that the proposed generic has the "same" active ingredient as the approved drug. *See id.* at 1-2. The petition makes factual arguments why generic enoxaparin products should not be determined to be the "same" in ways that Aventis contends are relevant. *Id.*

### 1. Type (a): objectively baseless and subjective abuse of process

A type (a) theory—using the *Columbia Pictures* test—is designed for in-court litigation. Its inquiry into the legal and factual bases of an action translates only roughly to the administrative context. It can only apply to the extent the petition makes arguments on the law.

*Columbia Pictures* requires that the alleged conduct be "objectively baseless." 508 U.S. at 60 (1993) Second, the defendant must subjectively intend to

-21-

1   use the petitioning "*process*—as opposed to the *outcome* of that process—as an

2   anticompetitive weapon." *Id.*

3       <u>Ripeness.</u> A type (a) theory cannot be sustained at this time. Whether

4   Aventis' interpretation of the statutory "sameness" requirement is objectively

5   baseless is a matter of administrative discretion, subject to a separate body of law

6   for judicial review. Unless and until the FDA acts on the petition, this dispute is

7   not ripe.

8       If the FDA denies a citizen petition, then a *Columbia Pictures* theory may

9   lie. This was the position of a court in the Southern District of New York when it

10  evaluated Aventis' alleged conduct in a citizen petition unrelated to the petition

11  here at issue. *Louisiana Wholesale*, 2008 WL 169362, at *5, 2008 U.S. Dist.

12  LEXIS 3611, at *13-17 (S.D.N.Y. Jan. 18, 2008). The FDA rejected that citizen

13  petition, expressly stating the reasons why the petition was "unfounded" on both

14  the law and the facts. *Id.* at n.6. Relying on the FDA's statement of reasons for

15  rejecting that petition, together with additional allegations as to why Aventis "had

16  no reasonable chance of success," the *Louisiana Wholesale* Court refused to

17  dismiss the claim against Aventis.  *Id.*

18      On the other hand, if the FDA acts favorably on Aventis' petition, and that

19  action is caused by Aventis' petition, <u>and</u> a court determines that Aventis' and the

20  FDA's position violated the applicable legal standard for reviewing administrative

21  action, then a *Columbia Pictures* theory may be available. These events would be

22  the necessary predicates for the Court to determine whether Aventis' position, and

23  the FDA's decision in reliance on it, were objectively baseless. *Nat'l Park*

24  *Hospitality Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003). This is an

25  extremely heavy burden.

26      **2. Type (b): knowing and willful fraud**

27      <u>Legal standard.</u> Pleading a type (b) theory outside the patent context requires

28  a plaintiff to allege that the defendant "so misrepresented the truth . . . that the

-22-

entire . . . proceeding was deprived of its legitimacy." *Kottle*, 146 F.3d at 1063.

A type (b) theory requires fraud. The Ninth Circuit therefore applies Rule 9(b)'s heightened pleading standard. *Kottle*, 146 F.3d at 1063. Rule 9(b) applies to "all circumstances constituting fraud." Which elements of fraud are subject to Rule 9(b) is somewhat unsettled, but falsity, materiality, and reliance are subject to Rule 9(b), at least where plaintiffs "can reasonably be expected to have access" to the underlying facts. *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995), *cert. denied*, 517 U.S. 1183 (1995). The Court therefore subjects these elements to Rule 9(b) and assumes, but does not hold, that ordinary Rule 8(a) notice pleading applies to the other elements.

*Kottle*'s demanding fraud requirements—the fraud must be so great that the entire proceeding is "deprived of its legitimacy"—recognizes that antitrust law does not give courts *carte blanche* to regulate the regulators. *See Verizon Commc'ns, Inc. v. Law Offices of Curvis V. Trinko, LLP*, 540 U.S. 398, 405-07 (cautioning against antitrust intervention in regulatory schemes). Almost always, the agency's expertise puts it in a better position than a court to determine whether a petitioner is making fraudulent arguments.

In this case, however, it is not implausible under *Twombly* that Amphastar is in a better position than the FDA to recognize the fraud. This is because Amphastar had access to voluminous discovery documents during litigation of the patent claims in this case. Further, it is not implausible that this Court's protective order prevents Amphastar from disclosing to the FDA facts that would enable the FDA to detect Aventis' alleged fraud. *Accord* AREEDA, ANTITRUST LAW ¶ 205c2 (observing *Noerr-Pennington* should not apply where facts undermining false information are "peculiarly within the control of the antitrust defendant").

Falsity. The only falsity allegations go to whether Aventis has changed its manufacturing process since 1981. ¶¶ 27, 45(e). Given Amphastar's unique position—its discovery with respect to the patent infringement claims in this

1    case—some degree of falsity is plausible under *Twombly*.

2        However, Amphastar has not met the Rule 9(b) standard for alleging <u>why</u>

3    the falsity is severe enough to deprive the citizen petition proceeding of its

4    legitimacy. *Vess v. Ciba-Ceigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)

5    ("The plaintiff must set forth what is false or misleading about a statement, and

6    <u>why</u> it is false.") (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th

7    Cir. 1994) (emphasis added). Amphastar is in a position to explain how its

8    discovered documents undermine Aventis' allegedly false representation and why

9    it is plausible that the FDA cannot detect the alleged false representation itself,

10   thereby undermining the citizen petition process. This is especially true in light of

11   the fact that Amphastar has already pointed out to the FDA, in the citizen petition

12   proceeding, Aventis' frequent process changes. Letter from Stephen A. Campbell,

13   Senior VP, Regulatory Affairs, Amphastar Pharm., Inc. to Lester M. Crawford,

14   Acting Commissioner, FDA (June 1, 2004), *available at*

15   http://www.fda.gov/ohrms/dockets/dailys/04/June04/060804/03p-0064-c00002-

16   vol3.pdf (pointing out that publicly available records show Aventis' process has

17   changed at least seventeen times in eight years).

18       <u>Materiality.</u> Amphastar alleges that Aventis' representation to the FDA "was

19   highly material" to the citizen petition. ¶ 45(e). The Court has already taken notice

20   of the citizen petition. The central argument in the petition is that, for complex

21   products such as enoxaparin, the manufacturing process determines the product.

22       However, the materiality allegations do not satisfy Rule 9(b).

23   Notwithstanding the conclusory assertion of high materiality, the face of the citizen

24   petition is ambiguous as to whether Aventis' process representation is material to

25   the process-determines-the-product argument. FDA Docket No. 2003P-0064:CP1,

26   at 11 n.33. It appears likely that the representation about Aventis' own process—

27   stated in a footnote—is immaterial to its broader process-determines-the-product

28   argument. The SAC does not remedy the ambiguity by alleging how or why

1   Aventis' process representation is material to the argument.

2       Reliance. Even assuming materiality as to the process-determines-the-

3   product argument, the petition contains an argument about characterizing

4   enoxaparin products that may not rely on the alleged representation: Aventis

5   appears to contend that it has discovered structural features unique to Lovenox.

6   However, such a determination is more appropriate at the fact-finding stage. The

7   Court further notes a potential ripeness problem: if the alleged misrepresentation is

8   material as to a product-determines-the-process argument, but immaterial to a

9   characterization argument, the type (b) theory may not become ripe until after the

10  FDA acts and explains the arguments it relied on. Nevertheless, the Court assumes

11  that the applicable reliance pleading standard has been met.

12      Causation & damages. Contrary to Aventis' position, lack of FDA approval

13  does not bar causation or damages per se. There are two types of possible damages

14  flowing from the alleged fraud. First, exclusion from the market is potentially

15  cognizable. *Andrx*, 256 F.3d at 806-08; *Louisiana Wholesale*, 2008 WL 169362, at

16  *6, 2008 U.S. Dist. LEXIS 3611, at *17-20; *Amgen, Inc. v. Hoffmann-La Roche

17  Ltd.*, 480 F. Supp. 2d 462, 467-68 (D. Mass. 2007). Second, expenses related to

18  defending a type (b) sham flow from the fraud.

19      For its market exclusion theory, Amphastar must plead that it intends to

20  enter the market, that it is prepared to enter the market, and that it would have

21  entered the market by now but for Aventis' conduct. The D.C. Circuit addressed a

22  similar complaint in *Andrx Pharma., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 807

23  (D.C. Cir. 2001). The *Andrx* Court held that a company lacking FDA approval can

24  still allege causation if it can allege the "intent and capacity to enter the market"

25  but for the defendant's antitrust violation. *Id.* Without this causation test, Hatch-

26  Waxman's automatic stay would always bar causation, even if the FDA or patent

27  enforcement conduct was plainly anticompetitive. *See* 21 U.S.C. § 355(c)(3)(C);

28  HOVENKAMP, IP AND ANTITRUST § 7.4e1.

1    Aventis mischaracterizes the D.C. Circuit's holding as turning only on the

2    fact that the *Andrx* District Court was not informed that the FDA had approved the

3    plaintiff's application. This is incorrect: *Andrx* used this fact to illustrate why

4    dismissal with prejudice was improper—the *Andrx* plaintiff was plainly able to

5    allege facts that would meet the causation standard. *Id.* at 808 ("And even before

6    the FDA approved [plaintiff's] ANDA, [plaintiff] could have alleged its intent and

7    preparedness to enter the market . . . ."). The market exclusion test is intent and

8    preparedness to enter the market, but for the defendant's misconduct.

9    But Amphastar has not pled intent and preparedness but for Aventis'

10   conduct. Amphastar must allege that (1) that the citizen petition is a material cause

11   of delay to FDA approval, *Zenith* 395 U.S. at 114 n.9; (2) that Amphastar intends

12   to enter the market with reasonable speed upon FDA approval; and (3) that

13   Amphastar is prepared to enter the market with reasonable speed upon FDA

14   approval. The factual allegations that would support causation are within

15   Amphastar's knowledge. Such facts may include whether the FDA has expressed

16   other concerns with regard to Amphastar's application, whether Amphastar has a

17   good faith basis to believe the FDA will not grant approval before the citizen

18   petition has been disposed, whether Amphastar has completed all other FDA-

19   required steps thus far to the FDA's satisfaction, and whether Amphastar has the

20   manufacturing capacity and suppliers available to enter the market with reasonable

21   speed upon approval. *See Andrx*, 256 F.3d at 807 (discussing indicia of

22   preparedness).

23   Further, one SAC allegation undermines Amphastar's preparedness:

24   Amphastar alleges that it is having difficulty obtaining "the supply of components

25   or compositions necessary for market approval or marketing of enoxaparin."

26   ¶ 45(g). The Court turns to another problem with this allegation in Section III.E

27   *infra*.

28   On the damages flowing from Aventis' enforcement conduct, the SAC

adequately pleads that Aventis' citizen petition conduct caused Amphastar to expend resources defending Aventis' allegation. ¶ 47. This states damages for a type (b) fraud, but the other elements have not been pled. Whether these damages, without more, could constitute antitrust injury is discussed in the substantive antitrust analysis below in Section III.F.

### 3. Type (c): fraudulent course of conduct

A type (c) theory to deprive Aventis' FDA conduct of *Noerr-Pennington* immunity requires (1) a subjective policy of making representations regarding enoxaparin before the FDA, (2) a substantial number of which lack objective merit.

Amphastar alleges a single citizen petition with a single alleged misrepresentation. ¶¶ 27, 45(e). This is not a fraudulent course of conduct.

As the foregoing discussion should make clear, it is not impossible to allege a *Noerr-Pennington* exception in the citizen petition process, but it is extraordinarily difficult. Amphastar has not satisfied the requirements.

### E.   The Vague Allegation Regarding Market Foreclosure Does Not Suffice

*Noerr-Pennington* does not facially apply to one antitrust allegation in the SAC: "On information and belief, Aventis has, or has attempted to, control the supply of components or compositions necessary for market approval or the marketing of enoxaparin." ¶ 45(g).

This vague allegation does not give Aventis adequate notice of anything. It also fails the *Twombly* plausibility test as a matter of law. It is always possible that one competitor attempts to exclude (or does exclude) another from a market; and that exclusion may, in some circumstances, amount to an antitrust violation. But such a bare and conclusory allegation of exclusion is not enough to cross "the line from the conceivable to plausible." *Twombly*, 127 S. Ct. at 1974. Amphastar must plead the facts, if any, that give rise to its inference that Aventis is engaging in illegal exclusion. Facts about Amphastar's difficulty obtaining supplies, and the factual foundation for the inference that exclusionary conduct by Aventis caused

1   the difficulty, are within Amphastar's knowledge. *Concha*, 62 F.3d at 1503.[9]

2   **F.   The SAC Does Not State a Claim**

3   The only allegations that survive *Noerr-Pennington* and *Twombly* are those

4   related to Aventis' patent conduct. ¶¶ 20-31, 45(a)-(d), (f). These allegations fail

5   on antitrust injury.

6   Ninth Circuit law governs § 2's substantive elements. *Nobelpharma*, 141

7   F.3d at 1068. Again, monopolization requires (1) monopoly power in the relevant

8   market and (2) willful acquisition or maintenance of that power (3) by misconduct

9   that (4) caused injury to competition or the competitive process, thereby harming

10  the plaintiff. *Supra* Section III.A.

11  <u>Monopoly power in the relevant market.</u> Amphastar alleges that Aventis has

12  monopoly power in a plausible market. The alleged market is that for enoxaparin

13  products in the United States. ¶ 45. Aventis plausibly has monopoly power in this

14  market because it has the only enoxaparin product approved for marketing in the

15  United States. ¶¶ 45(a)-(d).

16  <u>Anticompetitive misconduct.</u> Amphastar adequately alleges that Aventis'

17  patent-related conduct was fraudulent and thereby escapes *Noerr-Pennington*

18  immunity under *Walker Process*. *Supra* Section III.B.2. This fraud suffices for

19  § 2's conduct element under *Walker Process*. *Nobelpharma*, 141 F.3d at 1071.

20  <u>Antitrust injury & causation.</u> "Only an actual competitor or one ready to be a

21  competitor can suffer antitrust injury." *Bourns, Inc. v. Raychem Corp.*, 331 F.3d

22  704, 711 (9th Cir. 2003). Patent defense expenses alone may constitute antitrust

23  injury if the defendant is an actual competitor or ready to be a competitor.

24  *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 988-89 (9th Cir. 1979) (holding

25  that patent litigation expenses may be an antitrust injury where both parties were

26

27  [9] Even giving Amphastar the benefit of inferences from its *Walker Process* claim,
28  the SAC still has not made this non-*Walker Process* conduct any more than
    conceivable.

-28-

competitors in the relevant market when enforcement began). *Accord Indium Corp. of Am. v. Semi-Allows, Inc.*, 781 F.2d 879, 882 (Fed. Cir. 1985) (holding that there can be no antitrust injury unless plaintiff was prepared to enter the market); *Amgen*, 480 F. Supp. 2d at 468 (holding that *Walker Process* litigation expenses in a Hatch-Waxman suit can be an antitrust injury <u>after</u> concluding intent and preparedness was adequately pled); *Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.*, 2004 WL 1427136, at *6-7, 2004 U.S. Dist. LEXIS 11552, at *14-17 (E.D. Pa. June 21, 2004) (holding that litigation expenses alone are not an antitrust injury).[10]

In the Hatch-Waxman context, a company is "ready to be a competitor" if it meets the *Andrx* intent and preparedness test. 256 F.3d at 806-08.

Again, only the *Walker Process* allegations survive *Noerr-Pennington.* The only damages that are cognizable are those flowing from *Walker Process* enforcement. ¶ 47. Therefore, lack of FDA approval is a causation bar that Amphastar cannot surpass unless it pleads a *Noerr-Pennington* exception to the Aventis' FDA-related conduct <u>and</u> alleges market exclusion injury under the *Andrx* intent-and-preparedness test. Amphastar has not done so; it therefore cannot claim to have suffered antitrust injury as a matter of law. *Supra* Section III.G.3.

**G. The Court Declines to Address the State Law Claims at this Time**

Because the SAC states no federal claim, the Court declines to address its

---

[10] To the extent *Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 540, 544-46 (D.N.J. 2000), may suggest that Hatch-Waxman requires a different approach, it is disapproved in light of the 2003 decision in *Bourns* and the 2001 decision in *Andrx*. However, the better reading of *Bristol-Myers* is that the plaintiff there had adequately shown on summary judgment that the Hatch-Waxman automatic thirty-month stay may have been a material cause of the approval delay and that, in light of the automatic stay, requiring further indicia of preparedness was unreasonable. *Id.* at 546 (rejecting the proposed legal standard that a company subject to the Hatch-Waxman stay must be "<u>fully</u> prepared to enter the market" and emphasizing the automatic nature of the stay (emphasis added)).

1    state claims at this time. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350
2    n.7 (1988).

3         The Court does observe that the SAC does not provide adequate notice of
4    which common law business tort Amphastar proposes—"common law unfair
5    competition" is not enough. *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular*
6    *Tel. Co.*, 20 Cal. 4th 163, 192-93 (1999) (discussing the amorphous scope of
7    California common law unfair competition and some theories it may encompass).
8    Nor is it clear whether Aventis' alleged false statements about Lovenox's
9    therapeutic levels were made to the FDA—and therefore would be subject to
10   *Noerr-Pennington*—or if they were made to the prescribing and consuming public.
11   *See* ¶ 50.

12   **IV.**

13   **CONCLUSION**

14        The SAC is DISMISSED WITHOUT PREJUDICE. Because Amphastar
15   does not state a claim, Amphastar's application for discovery is DENIED.

16        The Court will set a status conference to discuss whether Amphastar may
17   replead.

18

19        IT IS SO ORDERED.

20

21   DATED:__February 17, 2009___    _Mariana R. Pfaelzer_____

22                               Hon. Mariana R. Pfaelzer
                            United States District Judge